Argued and submitted November 1, 1994, decision of the Court of Appeals affirmed on different grounds and judgment of the circuit court affirmed March 30, 1995

## In the Matter of the Adoption
## and Change of Name of
## Yasha Raynae Weathersby, a Minor.

### Carl STUBBS
### and Yvonne Stubbs,
### *Respondents on Review,*

*v.*

### Thomaszine WEATHERSBY,
### *Petitioner on Review.*

### (CC 58-90-00971; CA A78470; SC S41287)

892 P2d 991

Cristina Sanz, of Lane County Legal Aid Services, Inc., Medford, and Maureen H. McKnight, of Oregon Legal Services, Corp., Portland, argued the cause on behalf of petitioner on review. On the petition was Cristina Sanz.

Greg A. Hunt, Eugene, argued the cause on behalf of respondents on review.

Julie A. Stevens and Robin J. Selig, of Multnomah County Legal Aid Service, Inc., Portland, and Joan Zorza and Nancy S. Erickson, of National Center on Women and Family Law, Inc., New York, New York, filed an *amici curiae* brief on behalf of Multnomah County Legal Aid Service, Inc., and National Center on Women and Family Law, Inc.

UNIS, J.

**UNIS, J.**

Mother appeals from the decision of the Court of Appeals that affirmed the trial court's decree of adoption of Mother's minor daughter (Child) by Carl and Yvonne Stubbs. *Stubbs v. Weathersby*, 126 Or App 596, 869 P2d 893 (1994). For reasons that follow, we affirm, but on different grounds.

When Mother was five months pregnant with Child, she moved from Texas to Washington state. Child was born March 14, 1989, in Washington. When Child was less than one month old, Mother met with the Stubbses, who lived in Oregon, to discuss the possibility of having the Stubbses care for Child. Because the Stubbses were interested only in adopting Child, no agreement resulted, and Mother retained custody of Child. Mother and Child lived together in a crisis pregnancy shelter until April 17, 1989. At that time, Mother voluntarily placed Child in foster care with Catholic Community Services in Washington, because Mother was required to move out of the shelter and had no other place to live.

In June 1989, Mother rented an apartment and sought to regain physical custody of Child. The agency refused to relinquish custody and filed a juvenile court dependency proceeding in King County, Washington, on June 28, 1989. A hearing was held on June 29, 1989, and the court ordered that Child be continued in foster care. Another hearing was held on July 28, 1989, at which time the court again ordered that Child be continued in foster care. While Child was in foster care, Mother visited Child once or twice a week.

In October 1989, Mother was forced to move out of her apartment because her apartment was sold. Child remained in foster care. Mother informed Dr. Virginia Phillips that she wanted to place Child for adoption. Dr. Phillips was aware that the Stubbses were interested in adopting a child, and she informed them that Child was available for adoption.

On November 1, 1989, Yvonne Stubbs went to Washington from Oregon to pick up Child. Mother typed and signed a document dated November 1, 1989, which stated:

> "[Child] has been placed in the care of Yvonne Stubbs and Carl Stubbs, by [Mother].

"They will be caring for her during this adoptive process, after which they will become her legal parents."

The document was not notarized or witnessed. Yvonne Stubbs returned to Eugene, Oregon, with Child. On November 8, 1989, the juvenile court dependency proceedings pending in Washington state were dismissed.

On January 11, 1990, Mother telephoned the Stubbses and told them that Child's father might want Child back. On January 30, 1990, the Stubbses filed a petition for adoption of Child in Lane County Circuit Court, asserting that Mother had consented to the adoption in writing. On February 1, 1990, the court entered an order appointing the Stubbses as temporary guardians of Child.

In February 1990, Mother told the Stubbses that she wanted Child back. On April 2, 1990, Mother sent a letter to the circuit court, stating, "I would like to inform the court that I have *revoked* my consent to have my child adopted!!! * * * I am in *no* way consenting to my daughter being adopted!!!" (Emphasis in original.)

Mother later obtained representation by counsel. Mother filed two motions to dismiss the adoption proceeding, which were denied. Mother intervened in the adoption proceeding and filed objections to the petition for adoption.

On December 28, 1990, the Stubbses filed a supplemental petition for adoption. In addition to Mother's alleged consent, the supplemental petition alleged that Mother, without just and sufficient cause, had willfully deserted or neglected to provide proper care and maintenance for Child for the year preceding the filing of the supplemental petition. A trial was held in April 1991. The trial court, applying Oregon law, concluded that Mother had consented to the adoption and that Mother was estopped from revoking her consent. The trial court also concluded that, for one year preceding the filing of the supplemental petition, Mother had willfully neglected, without just and sufficient cause, to provide proper care and maintenance for Child. The circuit court granted the Stubbses' petition for adoption. Mother appealed.

In June 1992, the Court of Appeals remanded the case to the circuit court for a hearing to determine whether

the circuit court had jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA), ORS 109.700 to 109.930. *Stubbs v. Weathersby*, 113 Or App 501, 833 P2d 1297 (1992). After a hearing on remand, the circuit court entered a judgment that "ratified and confirmed" the prior judgment.

Mother again appealed, arguing (1) that the circuit court lacked jurisdiction under the UCCJA and that Oregon was an inconvenient forum, (2) that Washington law applied to the adoption proceeding, (3) that she never executed a valid irrevocable consent to the adoption, (4) that she validly revoked her alleged consent, and (5) that the circuit court erred in finding that she had neglected Child without just and sufficient cause for one year.

The Court of Appeals affirmed, holding that the circuit court had jurisdiction under ORS 109.730(1)(b) and that Oregon was a proper forum. *Stubbs*, 126 Or App at 600-02. The court, applying Oregon law, also held that Mother had consented to the adoption and that Mother was estopped from revoking her consent. *Id.* at 602-08. One judge dissented, because he believed that the circuit court lacked jurisdiction under the UCCJA. *Id.* at 608-13 (Landau, J., dissenting). We allowed Mother's petition for review and now affirm the decision of the Court of Appeals on different grounds and affirm the judgment of the circuit court.

## JURISDICTION

We first address whether the trial court had jurisdiction under the UCCJA, ORS 109.700 to 109.930. The UCCJA applies to adoption proceedings. *State ex rel Torres v. Mason*, 315 Or 386, 848 P2d 592 (1993).[1]

The UCCJA provides four bases for jurisdiction: (1) "home state" jurisdiction, (2) "significant connection" jurisdiction, (3) "emergency" jurisdiction, and (4) "default" jurisdiction. ORS 109.730(1). Each basis of jurisdiction under the UCCJA depends on the factual circumstances surrounding the child custody proceeding. To determine jurisdiction, we consider the facts as of the date that the adoption proceeding was commenced. *Torres*, 315 Or at 393 n 6.

---

[1] ORS 109.309(2)(a), enacted in 1993, now specifically provides that the UCCJA applies to adoption proceedings. Or Laws 1993, ch 717, § 2.

Ordinarily, a proceeding is deemed "commenced" when the complaint is filed. ORCP 3. This case involves an initial petition for adoption and a supplemental petition. The initial petition was filed on January 30, 1990. That petition alleged as the sole basis for adoption that Mother had consented to the adoption. The Stubbses filed a supplemental petition on December 28, 1990,[2] alleging that Mother had neglected child from December 28, 1989, to December 28, 1990. We must consider whether, for the purposes of the UCCJA, this proceeding is deemed "commenced" as of the filing of the initial petition or as of the filing of the supplemental petition for adoption.

The UCCJA is to be construed to promote the purposes of that act as set forth in ORS 109.720(1). ORS 109.720(2). A number of those purposes bear on the determination of when the proceeding is deemed "commenced" for the purposes of determining jurisdiction. The UCCJA is intended to, among other things, (1) avoid jurisdictional conflicts with courts of other states, (2) assure that child custody litigation ordinarily takes place in the state with which the child and the family of the child have the closest connection and where significant evidence concerning care, protection, training, and personal relationships of the child is most readily available, (3) discourage continuing controversies over child custody, (4) deter abductions and other unilateral removals of children undertaken to obtain custody awards, and (5) avoid the relitigation of custody decisions. ORS 109.720(1).

■ Based on the purposes of the UCCJA, it is clear that an amendment to a petition for adoption ordinarily will not affect the date as to which jurisdiction is determined. Such a practice would encourage abduction of children and lead to continuing controversies over child custody disputes. Indeed, when a pleading is amended, the date of the amended pleading relates back to the date of the initial pleading "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or

---

[2] The pleading filed on December 28, 1990, was labelled by the Stubbses as an "amended petition." As we discuss in the text of this opinion, *infra*, the petition is in fact a supplemental, not an amended, petition, and we refer to that petition as the "supplemental petition."

attempted to be set forth in the original pleading." ORCP 23 C. Thus, when a party files a petition for adoption and then amends the petition at a later date when the facts on which UCCJA jurisdiction is based are more favorable to the petitioner, the amendment generally will not affect the date on which the proceeding was "commenced."

That general rule does not apply to the circumstances in this case, however. The allegation of neglect in the supplemental petition did not arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; therefore, it does not relate back to the original petition. Instead, the Stubbses' supplemental petition alleges conduct that had not occurred at the time of the initial pleading. For that reason, it is a supplemental pleading, *i.e.*, a pleading "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." ORCP 23 E. Supplemental pleadings do not relate back under the rules of civil procedure.[3]

We do not mean to suggest that every time a supplemental petition is filed the court will use the later date in determining jurisdiction, because such a rule could encourage abduction of children, contrary to the express purpose of the UCCJA. If the supplemental petition alleges conduct that could have been alleged at the time of the initial petition, parties would be encouraged to allege only some of their claims, saving others for a later time when they had established jurisdiction under the UCCJA. When a later petition

---

[3] Moreover, the substance of the supplemental pleading makes clear that the supplemental pleading cannot relate back to the original date. The supplemental petition is based on ORS 109.324, which provides in part:

"[I]f the court finds that [the] parent has willfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child *for one year next preceding the filing of the petition for adoption*, the consent of such parent at the discretion of the court is not required and, if the court determines that such consent is not required, the court shall have authority to proceed regardless of the objection of such parent." (Emphasis added.)

A claim under ORS 109.324 that a parent has willfully deserted or neglected the child for a year is measured from the time of the filing of the petition for adoption. In this case, the Stubbses' supplemental petition alleges neglect from December 28, 1989, to December 28, 1990. Thus, for purposes of ORS 109.324, the date of the "filing of the petition for adoption" is December 28, 1990. Because the petition alleging neglect is deemed filed on December 28, 1990, the action "commenced" on that date.

alleges conduct that *could not* have been alleged in the initial petition, however, the danger of encouraging abduction is less. In such cases, determining jurisdiction as of the date of the supplemental petition promotes the purposes of the UCCJA by having cases litigated in the state with the closest connection to the child and avoiding relitigation of child custody disputes.

We emphasize that, in the ordinary case, an amendment to a pleading does not allow a party to have the court obtain jurisdiction by delay. First, as previously stated, an amended pleading *does* relate back to the date of the initial pleading. ORCP 23 C. Only in cases in which the substance of the petition (as distinct from facts regarding UCCJA jurisdiction) is based on facts that have occurred *after* the initial petition, and that ground could not have been alleged at the time of the initial petition, will the courts measure jurisdiction from the time of the supplemental filing. Second, when the child has been removed from his or her "home state," a parent may file a child custody action in the "home state" within six months after the child is removed, protecting parents from having their children abducted. ORS 109.730(1)(a). Third, if a party seeks to delay proceedings in order to establish jurisdiction, the court may decline to exercise jurisdiction. *See* ORS 109.780 (court may decline jurisdiction if party has engaged in wrongful conduct).

■■ We conclude that, when a supplemental pleading is filed that alleges a different basis for an adoption based on conduct *after* an initial petition had been filed, the action is "commenced" on the date of the supplemental petition when the different ground for adoption alleged in the supplemental petition could not have been alleged at the time of the initial petition. In this case, that date is December 28, 1990, the date on which the Stubbses filed a supplemental petition for adoption alleging that Mother had willfully neglected Child from December 28, 1989, to December 28, 1990.[4]

---

[4] Determining when the proceedings in this case were "commenced" is critical, because it is apparent that as of January 30, 1989, Oregon did not have jurisdiction under the UCCJA. As of that date, Child had resided in Oregon for only three months. The trial court and the Court of Appeals concluded that Oregon had "significant connection" jurisdiction under ORS 109.730(1)(b). We disagree. To establish "significant connection" jurisdiction, "[t]here must be maximum rather than minimum contact with the state." Comment, UCCJA § 3, 9 ULA, part I, 144-45

■ For the reasons that follow, we conclude that, as of December 28, 1990, Oregon had jurisdiction over this case, because Oregon was Child's "home state." Under "home state" jurisdiction, ORS 109.730(1)(a), an Oregon court has jurisdiction if, among other things, Oregon is the child's "home state" at the time of the commencement of the proceeding. ORS 109.710(5) defines "home state":

> " 'Home state' means the state in which the child, immediately preceding the time involved, lived with the parents of the child, a parent, or a person acting as parent, for at least six consecutive months, and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period."

On December 28, 1990, Child had been living with the Stubbses in Oregon for more than six consecutive months. Although the Stubbses were not Child's "parents" at that time, they did meet the definition of "persons acting as parents." ORS 109.710(9) provides:

> " 'Person acting as parent' means a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody."

During the six months preceding December 28, 1990, the Stubbses had physical custody of Child. In addition, they were claiming a legal right to custody throughout that period by attempting to adopt Child. As of December 28, 1990, then, Oregon was Child's "home state." Therefore, under ORS

---

(1988). Physical presence of the child in this state is not alone sufficient to establish jurisdiction. ORS 109.730(2).

The evidence in the record concerning Child's connection with Oregon at the time the initial adoption petition was filed demonstrates that the Stubbses provided care for Child during the three months between November 1, 1989, and January 30, 1990. During that period, Child's only connection with Oregon was her physical presence in the state for three months.

As noted, mere physical presence is not enough to establish "significant connection" jurisdiction. Indeed, the Official Comment states that "[s]hort-term presence in the state is not enough [to establish a 'significant connection'] even though there may be an intent to stay longer." Comment, UCCJA § 3, 9 ULA, part I, 145 (1988). Child's short-term presence in Oregon was insufficient to establish "significant connection" jurisdiction as of January 30, 1989. *See State ex rel Torres v. Mason*, 315 Or 386, 848 P2d 592 (1993) (one month presence in Oregon insufficient to establish "significant connection" jurisdiction).

109.730(1)(a), the circuit court had jurisdiction to proceed with the adoption under the supplemental petition.[5]

## CONSENT

■　Before entering a decree of adoption, the court must determine that the natural parents of the child consented to the adoption or that the parents' consent is not necessary by virtue of a statutory exception to the general requirement for consent. ORS 109.312(1); *Eder v. West,* 312 Or 244, 260, 821 P2d 400 (1991). We therefore begin by examining whether Mother consented to the adoption of Child by the Stubbses.

The Stubbses allege that Mother consented to the adoption by typing out and signing a document that stated:

"[Child] has been placed in the care of Yvonne Stubbs and Carl Stubbs, by [Mother].

"They will be caring for her during this adoptive process, after which they will become her legal parents."

The document was prepared and signed by Mother in Washington state. It was not notarized or witnessed.

Mother contends that the above-quoted document that she signed is insufficient to constitute consent to the adoption. Mother first argues that Washington law should apply to the validity of the consent and that, under Washington law, the consent is insufficient. She also contends that the consent is insufficient under Oregon law. The Stubbses argue that Oregon law applies and that the document does constitute consent under Oregon law.

■　We first consider whether Oregon law or Washington law applies to the question of consent. Generally, the law of the forum state applies to adoption cases. Restatement (Second) of Conflict of Laws § 289 (1969). When a parent's consent to an adoption is at issue, however, we are reluctant to follow that rule without further analysis. A consent to an adoption can have the ultimate effect of terminating all of the

---

[5] Because of our conclusion regarding jurisdiction, we need not consider whether, when a state other than Oregon is a child's "home state" and the child has a "significant connection" with Oregon, there is concurrent jurisdiction under the UCCJA or whether the UCCJA gives preference to "home state" jurisdiction. *See Stubbs v. Weathersby,* 126 Or App 596, 608-13, 869 P2d 893 (1994) (Landau, J., dissenting) (arguing that the UCCJA gives preference to "home state" jurisdiction).

individual's parental rights. As a consequence, the state in which the consent is signed or where the parent-child relationship exists will often have an interest in having its law applied regarding the validity of a parental consent in an adoption proceeding. In addition, applying the law of the forum state creates dangers of forum shopping in adoption cases. Nevertheless, because the UCCJA mitigates those potential dangers, we conclude that the general choice-of-law rule concerning adoption cases should apply to the present case.

■ The UCCJA is intended to prevent forum shopping and is designed to insure that child custody litigation ordinarily takes place in the state with the closest connection to the child. ORS 109.720(1). Thus, when a state has jurisdiction in a child custody matter, the UCCJA guarantees that the forum state has an interest in applying its own law to the case. We therefore conclude that, except in unusual circumstances,[6] the law of Oregon applies to issues arising out of adoption petitions properly filed in Oregon, including questions of consent.

■ This case does not present any unusual circumstances that would justify departing from that general rule. When Mother signed the document and released custody of Child to the Stubbses, she knew that they were Oregon residents. It is apparent that the parties contemplated that the adoption would take place in Oregon courts.

■ We turn to the question whether the document signed by Mother constitutes a valid consent to adoption under Oregon law. Under Oregon law, a parent must provide *"consent in writing."* ORS 109.312(1) (emphasis added).[7]

---

[6] *See Matter of Appeal in Pima Cty. Juv. Act. No. B-7087,* 118 Ariz 428, 577 P2d 714 (1978) (Arizona court applied law of Arkansas when parties intended that the adoption would take place pursuant to the law of Arkansas).

[7] ORS 109.312(1) provides:

"Except as provided in ORS 109.314 to 109.329, consent in writing to the adoption under ORS 109.309 of a child shall be given by:

"(a) The parents of the child, or the survivor of them.

"(b) The guardian of the child, if the child has no living parent.

"(c) The next of kin in this state, if the child has no living parent and no guardian.

"(d) Some suitable person appointed by the court to act in the proceeding as

Moreover, when a petition for adoption is filed, the petitioner is required to file, at the time of the petition for adoption, "[t]he *documents demonstrating consent* under ORS 109.312 to the adoption of the minor child." ORS 109.309(5)(a)(B) (emphasis added). Those statutes suggest that the writing itself must, on its face, evince a present intent to consent to adoption.

■ ■ When a parent consents to adoption, an adoption based on that consent will terminate any parental rights the parent has with regard to the child. *See Eder*, 312 Or at 261 (adoption is a two-step process, the first of which is the termination of the parent's rights); *Zockert v. Fanning*, 310 Or 514, 518, 800 P2d 773 (1990) (stating same principle). Consent to an adoption is ordinarily a jurisdictional prerequisite for a decree of adoption. *In re Estate of Myers*, 197 Or 520, 533, 254 P2d 227 (1953).

■ Parental rights are significant. *See Zockert*, 310 Or at 528 (parenthood is a "liberty interest"); *Williams et ux v. Capparelli*, 180 Or 41, 44, 175 P2d 153 (1946) ("[t]he maintenance of the natural rights of parents to the custody and care of their children is of vital interest to the state"). The requirement that consent to adoption be in writing is designed to protect those important interests. In evaluating a parent's consent to an adoption, this court requires strict compliance with statutory requirements. *See Myers*, 197 Or at 525 (all statutory requirements for an adoption "must be strictly complied with"). That is particularly true regarding a parent's consent, because the consent can operate to terminate the parental rights of the parent. *See State v. Jamison*, 251 Or 114, 117, 444 P2d 15, 444 P2d 1005 (1968) ("[t]he permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants").

■ The importance of protecting parental rights has been recognized by the legislature in other contexts where a written consent to adoption is required. ORS 418.270(1), which governs the requirements for a parent's consent to adoption in an agency adoption, provides in part:

next friend of the child to give or withhold consent, if the child has no living parent and no guardian or next of kin qualified to consent."

> "If licensed for such purposes by the Children's Services Division, a private child-caring agency may receive children from their parents or legal guardians for special, temporary or continued care. The parents or guardians may sign releases or surrenders giving to such agencies guardianship and control of the persons of such children during the period of such care, which may be extended until the children arrive at legal age. *Such releases do not surrender the rights of such parents or guardians in respect to the adoption of such children and do not entitle such organization to give consent to the adoption of the children unless the release or surrender expressly recites that it is given for the purpose of adoption.*" (Emphasis added.)

By requiring a surrender or release to "expressly recite[] that it is given for the purposes of adoption," ORS 418.270(1) affords parents protection in the context where parents are dealing with agencies licensed by the state of Oregon. We do not believe that the legislature intended parents to have less protection when dealing with unlicensed individuals. We conclude that, to constitute effective written consent, a document must evidence a clear and unequivocal intent to consent to the adoption of the child.

Mother argues that the document that she signed does not constitute a valid consent to the adoption. The document, read as a whole, demonstrates that Mother intended the Stubbses to have custody of Child during the process of an adoption. We need not decide whether the document expresses a clear and unequivocal intent to consent to the adoption, however, because, even if the document signed by Mother was an effective consent, we conclude that mother revoked any consent that she had given to the adoption.

■ A formal revocation of consent filed with the court is effective to revoke a parent's consent to an adoption. *Dugger et ux v. Lauless*, 216 Or 188, 193, 338 P2d 660 (1959). Once a proceeding has been instituted, however, a parent cannot withdraw his or her consent by mere extrajudicial notification to the adoptive parents. *Id.* Rather, some form of notice must be provided to the court. *See id.* (notification that the parent revoked his consent was effective when the notification was made to a caseworker and the information was included in a report to the court).

■ In this case, Mother's revocation of any alleged consent was timely and legally sufficient. Mother sent a letter to the circuit court, stating her intention to revoke her alleged consent. Moreover, the report of the Children's Services Division filed with the court states that Mother "stated several times that she wanted to make it clear that she is not giving up her child for adoption." Mother also filed a motion to dismiss with the court, specifically alleging that she had revoked "any instrument that might be construed to be her consent to the adoption."

■ Generally, a parent may revoke his or her consent to an adoption at any time before the final decree of adoption is entered. *Williams*, 180 Or at 45; *but see Dugger*, 216 Or at 198 (suggesting that parent may be estopped from revoking his or her consent). The right to revoke consent is not absolute, however. A parent may agree to make his or her consent irrevocable, in which case consent may be revoked only for fraud or duress. ORS 109.312(2).

ORS 109.312(2) provides the method by which a parent's consent to an adoption is irrevocable:

"(a) A person who gives consent to adoption under subsection (1) of this section may agree concurrently or subsequently to the giving of such consent that the consent shall be or become irrevocable, and may waive such person's right to a personal appearance in court, by a duly signed and attested certificate. The certificate of irrevocability and waiver shall be in effect when the following are completed:

"(A) The child is placed for the purpose of adoption in the physical custody of the person or persons to whom the consent is given;

"(B) The person or persons to whom consent for adoption is given have filed a petition to adopt the child in a court of competent jurisdiction;

"(C) The court has entered an order appointing the petitioner or some other suitable person as guardian of the child pursuant to ORS 109.335;

"(D) The Children's Services Division, an Oregon licensed adoption agency or an attorney who is representing the adoptive parents has filed either a Children's Services Division or an Oregon licensed adoption agency home study with the court approving the petitioner or petitioners as

potential adoptive parents or the Children's Services Division has notified the court that the filing of such study has been waived;

"(E) Information about the child's social, medical and genetic history required in ORS 109.342 has been provided to an attorney or the Children's Services Division or an Oregon licensed adoption agency by the person giving consent to the adoption; and

"(F) The person signing the certificate of irrevocability and waiver has been given an explanation by an attorney who represents the person and who does not also represent the adoptive family, by the Children's Services Division or by an Oregon licensed adoption agency of the consequences of signing the certificate.

"(b) Upon the fulfillment of the conditions in paragraph (a) of this subsection, the consent for adoption may not be revoked unless fraud or duress is proved with respect to any material fact."

*See also* ORS 418.270(4) (providing for irrevocable consent in agency adoptions). In this case, it is undisputed that the procedures prescribed in ORS 109.312(2) were not followed. Therefore, Mother's consent was not irrevocable.

The Stubbses argue that, even though the procedures outlined in ORS 109.312(2) were not followed, Mother should now be deemed to be estopped to revoke the consent that she did give. As already noted, that was the theory on which the Court of Appeals ruled for the Stubbses. Assuming, without deciding, that there may be circumstances in which, despite the failure to comply with the statutory procedure for making a consent irrevocable, and despite the fact that adoption is a creature of statute, a parent may be estopped from revoking the parent's consent to adoption, we find no facts in this case that could justify the application of that doctrine here. We therefore reject the Stubbses' estoppel theory.

## NEGLECT

We now turn to the Stubbses' second asserted basis for the adoption and the alternative basis for the trial court's decision — neglect. A parent's consent to an adoption is not necessary if the parent has "willfully * * * neglected without

just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption." ORS 109.324. A parent's conduct constitutes willful neglect if, based on the totality of the evidence, the court concludes that, during the year preceding the filing of the petition for adoption, the non-consenting parent willfully failed to manifest substantial expressions of concern that show that the parent has a deliberate, intentional, and good-faith interest in maintaining a parent-child relationship. *Eder*, 312 Or at 266. In applying that standard to a claim of neglect, the court considers all relevant evidence, including payments of money, gifts, visits, calls, cards or letters, and other expressions of concern. *Id.* The court "may disregard incidental visitations, communications and contributions," however. ORS 109.324; *Eder*, 312 Or at 266. The burden is on the petitioners to demonstrate willful neglect by clear and convincing evidence. *Zockert*, 310 Or at 528.

 On *de novo* review of the issue of neglect,[8] we find that Mother willfully neglected Child without just and sufficient cause for one year preceding the filing of the supplemental petition for adoption on December 28, 1990. Specifically, we make the following findings with respect to the categories of evidence discussed in *Eder*.

1. Payment of money. Mother provided no financial support for Child during the year in question. Nor did Mother offer to provide any financial support for Child during the year in question. Although her income was not great ($700 per month), she did send $100 to $200 per month to her mother. Her financial support to another member of her

---

[8] When the Court of Appeals reviews an adoption decree, "the Court of Appeals shall try the cause anew upon the record." ORS 19.125(3). When reviewing cases reviewed *de novo* by the Court of Appeals, this court has discretion to limit our review to questions of law:

"When the Court of Appeals has tried a cause anew upon the record, the Supreme Court may limit its review of the decision of the Court of Appeals to questions of law." ORS 19.125(4).

In this case, however, the Court of Appeals did not address the issue of neglect. ORS 19.125 contemplates that an appellant will receive *de novo* review of an appeal from a case in equity. Because its analysis did not require it to address the issue of neglect, the Court of Appeals did not make complete factual findings with respect to that issue. As we have explained, our analysis dictates that the issue of neglect be addressed. In the circumstances, we choose to exercise our discretion by reviewing the facts surrounding that issue *de novo* at this level.

family shows that Mother's failure to provide any financial support to Child was willful.

2. Gifts. Mother sent no gifts, such as toys or clothing, to Child during the year in question. By contrast, she sent clothing to her other daughter, who lives in Mississippi with Mother's mother. Gifts sent by Mother to another member of her family shows that Mother's failure to do so with respect to Child was willful.

3. Visits. During the year in question, Mother visited with Child once, while Mother was in Eugene for a hearing regarding the adoption proceeding. Yvonne Stubbs, not Mother, initiated that visit. Mother did not request any additional visits during the year in question.[9] We also note that, by contrast, Mother saw her other daughter in August 1990 for ten days, showing that her lack of similar effort with respect to Child was willful. We disregard Mother's single, brief visit, because it was "incidental," ORS 109.423, and does not constitute a substantial expression of concern.

4. Telephone calls. Because of the young age of Child during the year in question, Mother's failure to call Child is not relevant. What is relevant, however, is that when Mother had telephone conversations with Yvonne Stubbs during the year in question, she asked nothing about Child and said nothing about wanting to parent Child. Similarly, when Etter had a telephone conversation with Mother, Mother asked no questions about Child and said nothing about wanting to parent Child. Those facts demonstrate a lack of concern and the absence of a deliberate, intentional, and good-faith interest in maintaining a parent-child relationship. Moreover, Mother calls Mississippi once or twice a week to speak with her mother and other daughter. Her failure to make similar contact respecting Child is evidence that her failure with respect to Child was willful.

5. Cards or letters. Mother sent no cards or letters to Child or to the Stubbses (or anyone else having knowledge

---

[9] Mother testifed that she was seeking visits through requests by her lawyer. To the extent that Mother's testimony is in conflict with the testimony of Yvonne Stubbs, we note that the trial court, which had the opportunity to observe the witnesses first hand, rejected Mother's version of events when it conflicted with the testimony of Yvonne Stubbs. The Court of Appeals did the same on *de novo* review of the consent issue. *Stubbs*, 126 Or App at 603.

of Child) regarding Child. Mother was 29 years old and had a college education, demonstrating that she had the capacity to have made such inquiries had she wished to do so.

■ Other expressions of concern. Mother pursued this litigation, contesting Child's adoption by the Stubbses. That was her only expression of concern during the year in question, and it is not enough to constitute a substantial expression of concern that shows that Mother had a deliberate, intentional, and good-faith interest in maintaining a parent-child relationship with Child. Certainly, a parent's effort to regain access to his or her child is a form of expressing concern. *Eder*, 312 Or at 269. However, in *Eder*, the parent did much more than merely pursue legal recourse; the parent also communicated often with the children by telephone and mail, sent birthday cards and gifts, sent money, and inquired of friends and relatives about the children's well-being. *Id.* By contrast, in this case, Mother did none of those things; the *only* thing that she did was to pursue this litigation.

Based on the totality of the evidence, we find by clear and convincing evidence that Mother willfully failed to manifest substantial expressions of concern that show that she had a deliberate, intentional, and good-faith interest in maintaining a parent-child relationship during the year in question. Accordingly, we conclude that the trial court did not err in finding neglect and in granting the adoption in this case.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the circuit court is affirmed.